IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

VINCENT EUGENE GOREE,

    Petitioner,                  No. CIV S-02-1779 GEB KJM P

    vs.

C.A. TERHUNE,

    Respondent.               FINDINGS AND RECOMMENDATIONS

          Petitioner, a state prisoner, is proceeding pro se with a petition for a writ of habeas corpus under 28 U.S.C. § 2254. He challenges his Sacramento County convictions for carjacking in violation of Cal. Penal Code § 215(a), possession of a firearm by a felon within the meaning of Cal. Penal Code § 12021.1(a), and the findings that he used a firearm to commit the offense within the meaning of Cal. Penal Code § 12022.53(b) and that he had suffered three prior strikes within the meaning of Cal. Penal Code § 1170.12. CT 124-127, 365. He argues he was denied his constitutional rights when the trial court denied his request for a live lineup prior to the preliminary hearing, counsel was ineffective in failing to introduce exculpatory evidence and his sentence violates the Eighth Amendment's proscription against cruel and unusual punishment.

/////

/////

I. <u>Background</u>

Based on a reading of the trial transcripts, this court adopts the state Court of Appeal's recitation of the facts developed at trial:

> At approximately 6:30 p.m., 80-year-old Leila Sibley was shopping at the Price-Less Drugstore. After loading her groceries and medications into her car, defendant approached Sibley and asked to borrow a pen. Sibley gave him a pen, and defendant then demanded her car keys. When Sibley ignored his demands, defendant grabbed her keys and purse. Sibley and defendant struggled over the purse, while Sibley yelled for help. Defendant eventually won the contest for Sibley's purse and headed toward her car.
>
> By this time, people began to respond to Sibley's calls for help. As Michael Almas, Barbara Morihara and Rolland Beireis approached, defendant pulled a gun from his waistband, threatened her would-be rescuers, told them not to move, and sped away in Sibley's car. Almas was within 20 or 30 feet of Sibley and defendant when defendant pointed a large gun at him and threatened him. Morihara, a special agent with the United States Immigration Service, got within about 40 feet of Sibley and defendant. Beireis got within about 30 feet of Sibley and defendant when he heard someone yell that defendant had a gun. He retreated and called 911.
>
> Around midnight that same day, Danielle Callahan, a friend of defendant's, and Thomas Curtis, her fiancee, saw defendant driving a gold Cadillac, later determined to be Sibley's. Callahan asked defendant where he got the car, and defendant told her not to worry about it as it was none of her business. Defendant gave Callahan Sibley's credit card, which she used to purchase gas. He then asked Callahan to follow him to North Sacramento, where he left the car in a parking lot behind some apartments.
>
> The following morning, Callahan again used Sibley's credit card, this time to purchase tires. This purchase ultimately led Detective Danny Minter to Curtis and Callahan.
>
> Minter prepared a photo lineup with Curtis's picture in it and showed the lineup to Sibley and three of the eyewitnesses, none of whom identified Curtis as the assailant. Defendant's picture was not in this lineup, and the witnesses specifically told the detective the suspect was not in the lineup. Further questioning of Callahan and Curtis revealed that they had received the credit card from defendant, and that he had been driving a gold Cadillac.
>
> Minter then obtained a photograph of defendant and prepared a lineup with his picture in it. In this picture, defendant had

shoulder-length straight hair. Minter showed the lineup to Sibley, Almas and Beireis. Only Beireis was able to identify defendant from this photograph, and that identification was largely uncertain.

Minter ultimately procured an arrest warrant for defendant and took a more current picture of him. Minter noted there was a "distinct difference in [defendant's] appearance between the two lineups." He showed the second photo lineup to Beireis, Morihara and Sibley. Beireis identified defendant. Morihara selected defendant's photograph and another photo from the lineup, indicating "those two photos were as close as she could recall the suspect being." Sibley also selected two photos from the lineup, one of which was defendant's.

The in-trial identifications of defendant were also somewhat uncertain. Sibley identified defendant at trial, but indicated he looked "a little bit different, the hairdo and everything." She expounded, stating, "in my mind, his hair was shorter and he looked very neat." On cross-examination, she testified that she became more certain in her identification of defendant when, at the preliminary hearing, he was asked by the judge to stand up. Sibley noted his height, build and movement made her more certain of her identification of defendant. Sibley admitted she had difficulty identifying people from photographs, and stated that when she was shown the first photo lineup, she "had difficulty because I kind of blocked on it a little bit and I didn't want to identify anyone that I had any doubts about at all."

Almas testified at trial that the gun was a major distraction interfering with his ability to definitively identify defendant. He stated he was 60-70 percent sure it was defendant. On cross-examination, he admitted he did not have a very good memory, so identifying someone several months after the incident would be difficult.

Morihara testified at trial that defendant looked "familiar." She also indicated it would be helpful to see defendant stand. When he stood, she testified, "His facial features look like the person I saw, however, the person I saw appeared a little bit thinner and it may have been because of the distance."

At trial, Beireis identified defendant with 80 percent certainty. He also testified he was more certain about his identification upon seeing defendant in person, than he was in the photographic lineup. On cross-examination, Beireis admitted he did not get a "full look at the face" of defendant that day, nor did he remember what he was wearing. He also testified he had trouble making a positive identification from the photographs, because the hairstyles were different, and did not become certain of his identification of defendant until he saw him in person.

> Defense witness Dr. Martin Blinder testified about various factors which can make eyewitness identifications more or less reliable. He testified high anxiety levels, expectations, cross-racial identifications, weapon focus and the passage of time can all make an eyewitness identification unreliable. Dr. Blinder admitted that these factors do not prohibit an accurate eyewitness identification.
>
> Dr. Blinder further testified there are factors which can validate the reliability of eyewitness identifications. These factors include separate eyewitness identifications, expressions of uncertainty or tentativeness in the identification, and physical evidence which corroborates the identification, particularly when the eyewitnesses are unaware of the corroborating evidence. Specifically, Dr. Blinder acknowledged a witness who indicates he is only 60-70 or 80 percent sure of his identification is more reliable than a witness who says he is 100 percent certain.

Answer, Ex. D at 2-6.

Petitioner was sentenced to a total term of forty years to life. CT 386.

II. <u>AEDPA Standards</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a).

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Although "AEDPA does not require a federal habeas court to adopt any one methodology," <u>Lockyer v. Andrade</u>, 538 U.S 63, 71 (2003), there are certain principles that guide its application.

/////

4

First, the "contrary to" and "unreasonable application" clauses are different. As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002). It is the habeas petitioner's burden to show the state court's decision was either contrary to or an unreasonable application of federal law. Woodford v. Visciotti, 537 U.S. 19, 25 (2002). It is appropriate to look to lower court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 2000).

Second, so long as the state court adjudicated petitioner's claims on the merits, its decision, no matter how brief, is entitled to deference. Lockyer, 538 U.S. at 76; Downs v. Hoyt, 232 F.3d 1031, 1035 (9th Cir. 2000). A court's "postcard" denial is a decision on the merits. Gaston v. Palmer, 387 F.3d 1004, 1013 (9th Cir. 2004). However, when the state court does not issue a "reasoned opinion," this court must undertake an independent review of the claims. Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002).

Third, in determining whether a state court decision is entitled to deference, it is not necessary for the state court to cite or even be aware of the controlling federal authorities "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2003). Moreover, a state court opinion need not contain "a formulary

/////

statement" of federal law, so long as the fair import of its conclusion is consonant with federal law.  Id.

III. Denial Of Petitioner's Motion For A Live Lineup

    A. Court of Appeal's Ruling

The Court of Appeal rejected petitioner's challenge to the denial of a live lineup, agreeing with the trial court that the request was not timely.  It continued:

> Moreover, this was not a case in which fundamental fairness required a "live" pretrial lineup.  In *Evans*,[1] the court defined the issue as follows: "The question is whether *prior* to the in-court receipt of evidence of identification the accused can insist that procedures be afforded whereby the weakness of the identification evidence, if it is in fact weak, can be disclosed.  The question is thus not one of fairness in receiving evidence but rather one of fairness to an accused on pretrial discovery." (*Evans*, *supra*, 11 Cal.3d at p. 622.)  The court went on to state, "As in all discovery matters an accused is entitled to the knowledge to be gained from a lineup sufficiently in advance of trial to prepare therefor." (*Id*. at p. 626.)
>
> Here, the pretrial photographic lineups provided defendant with that knowledge.  In addition, the photographs used in the lineups were available at trial.  Thus, "defense counsel had adequate opportunity to demonstrate [to the jury] the identification method's potential for error. (*People v. Rist* (1976) 16 Cal.3d 211, 217, superseded by statute on a different point.)  In this case, to the extent there were weaknesses in the identification evidence, defendant was aware of them well in advance of trial, and was able to fully reveal those weaknesses to the jury.
>
> The right to a lineup arises "only when eyewitness identification is shown to be a material issue and there exists a reasonable likelihood of a mistaken identification which a lineup would tend to resolve." (*Evans, supra*, 11 Cal.3d at p. 625.)  In this case, there was no such "reasonable likelihood of a mistaken identification which a lineup would tend to resolve."  The eyewitnesses initially identified defendant from a lineup, albeit a photo lineup.  At no time has defendant argued any due process violations arose from the photographic lineup.  He has not alleged the photographic lineup was conducted in an improper manner or was overly suggestive.  He has not suggested any manner in which the photographic lineup tainted the later in-court identifications of him.  Finally, defendant has never made any argument that there was

---

[1] Evans v. Superior Court, 11 Cal.3d 617 (1974).

6

1
2
>anything about the photographic lineups that would create a
>likelihood of mistaken identification which a live lineup would be
>likely to resolve.

3 Answer, Ex. D at 10-11.

4     B. <u>Analysis</u>

5        The Supreme Court has never held a criminal defendant has a constitutional right
6 to a pretrial lineup.  The Ninth Circuit explicitly has rejected any constitutional dimension to a
7 defendant's request for a pretrial lineup.  <u>United States v. Robertson</u>, 606 F.2d 853, 857-58 (9th
8 Cir. 1979) ("An accused has no absolute or constitutional right to a lineup."); <u>see</u> also <u>Sims v.</u>
9 <u>Sullivan</u>, 867 F.2d 142, 145 (2d Cir. 1989); <u>Bond v. Walker</u>, 68 F. Supp. 2d 287, 299-301 &
10 n.6 (S.D.N.Y. 1999) (collecting cases), <u>aff'd</u>, 242 F.3d 364 (2d Cir. 2000).  Accordingly, the state
11 court's rejection of this claim of error was not an unreasonable application of clearly established
12 law.

13        Moreover, an identification procedure violates a defendant's right to due process
14 only if it is so unreliable that it produces a "very substantial likelihood of irreparable
15 misidentification."  <u>Manson v. Brathwaite</u>, 432 U.S. 98, 116 (1977).  Indeed, even if police
16 engaged in suggestive procedures, the identification is still admissible if it is reliable.  <u>Id</u>. at 114
17 ("reliability is the linchpin in determining the admissibility of identification testimony").

18        Trial counsel cross-examined each of the eyewitnesses extensively on his or her
19 ability to describe, remember, and identify petitioner as the person who struggled with Ms. Sibley
20 for her purse and keys and drove off in her Cadillac.  He was able to establish Ms. Sibley's initial
21 reluctance to identify petitioner at the preliminary hearing and elicit her concession that she had
22 difficulties identifying anyone from the photographic lineups.  RT 70, 73.  During cross-
23 examination, Ms. Morihara said only that petitioner's picture in the last photo lineup "looks the
24 closest to me to what I saw."  RT 134.  Mr. Beireis told defense counsel that while he was "pretty
25 positive" that petitioner was the car-jacker, his "memory is not the best thing in the world."  RT
26 154, 157.  Moreover, trial counsel presented expert testimony about the vagaries of eyewitness

identification. RT 204, 213-219. Yet he never attacked the ultimate reliability of the identifications or raised any due process objection to the photo lineups or the in court identification.

It is true the jury's questions and requests for the rereading of testimony focused on identification. RT 363-364. It is equally true that the corroborating testimony from Callahan and Curtis could be discounted by their motive to distance themselves from the carjacking. <u>See</u>, <u>e.g.</u>, RT 97, 101, 110-112, 179-181. However, petitioner does not explain how a lineup, coming after the witnesses had been shown two photo lineups containing his picture and thus had become familiar with his face, would provide a more reliable identification. Moreover he has ignored the fact that Ms. Sibley became more sure of her identification at the preliminary hearing after she saw petitioner stand. RT 71. How a live lineup that would have included him standing, albeit with others, would have proven more reliable is not explained. CT 87, 90.

Accordingly, in light of the thorough airing of the problems with each of the eyewitness's identification, this court cannot say the state court unreasonably applied clearly established federal law in rejecting this claim.

IV. <u>Ineffective Assistance Of Counsel</u>

Petitioner argues trial counsel was ineffective for failing to introduce evidence that petitioner had requested a live lineup while proceeding in pro per, a circumstance that would have shown consciousness of innocence. The Court of Appeal rejected this argument:

> Defendant has not cited a single authority, nor has independent research revealed any, in which evidence was admitted to show "consciousness of innocence." In fact, to the extent this issue has been raised and decided in California, the courts have not allowed evidence of "consciousness of innocence." In the absence of any authority that a request for a lineup would be admissible as demonstrating consciousness of innocence, we are unwilling to find trial counsel's performance fell below objectively reasonable standards of professional competence.

Answer, Ex. D at 12-13.

/////

The federal law on claims of attorney ineffectiveness is clear:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

Strickland v. Washington, 466 U.S. 668, 687 (1984). "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Id. at 688. A court must "indulge a strong presumption" that counsel's conduct falls within the range of competence. Iaea v. Sunn, 800 F.2d 861, 864 (9th Cir. 1986). Accordingly, this court must determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance and petitioner must overcome the presumption that the act or omission might be an appropriate strategic decision. Strickland, 466 U.S. at 689, 690.

Counsel has no obligation to undertake frivolous or baseless actions and any failure to do so does not constitute ineffective assistance of counsel. Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). In this case, the Court of Appeal found any evidence of "consciousness of guilt" would not have been admissible, an interpretation of state law that binds this court. United States v. Colin, 314 F.3d 439, 443 (9th Cir. 2002); Mendez v. Small, 298 F.3d 1154, 1158 (9th Cir. 2002). Accordingly, the state court did not apply federal law unreasonably in rejecting petitioner's claim of ineffective assistance of counsel.

V. Cruel And Unusual Punishment

Petitioner argues a forty year sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment.[2] The Court of Appeal rejected the claim:

> The attempted minimization of defendant's conduct is offensive. Defendant went to a shopping center armed with a gun, looking for

---

[2] The term consists of a twenty-five-year-to-life sentence under California's three strikes law, an additional ten years for the use of a firearm, plus a five year enhancement for a prior serious felony conviction.

9

> someone to rob. He decided upon an 80-year-old woman as his victim, grabbed her cars [sic] keys and struggled with her over her purse. When people responded to her cries for help, he pulled out a gun, threatened to shoot them, and sped off in the victim's car. This was not a "minor offense"; it was an act of violence perpetrated against a particularly vulnerable victim.
>
> Defendant has an extensive criminal background beginning in 1980 and 1981 when he suffered juvenile adjudications for auto tampering, vehicle theft and reckless driving. Defendant's adult criminal history extends back to 1986, when he was convicted of kidnapping, assault with a firearm and robbery. The facts of that offense are disturbingly similar to the instant offense. Defendant again selected a woman in a Cadillac as his victim, approached her with a gun, and threatened her with it. He also threatened witnesses who attempted to come to the aid of his chosen victim. After wrecking that Cadillac, he broke into a home and held the residents at gunpoint. In 1990, defendant was convicted of being a felon in possession of a firearm, specifically, two loaded revolvers, a loaded shotgun and a rifle. In 1997, he was convicted of possession of methamphetamine. In 1998, he was convicted of assault with a deadly weapon when he got into a fight with his girlfriend and hit her on the head with a glass ashtray.
>
> Despite defendant's efforts to minimize his criminal history, this record reveals this defendant has been consistently violent and frequently chooses to arm himself to further his acts of violence.

Answer, Ex. D at 15-16.

In <u>Lockyer v. Andrade</u>, 538 U.S. 63 (2003) and <u>Ewing v. California</u>, 538 U.S. 11 (2003), the Supreme Court considered California's Three Strikes law. In <u>Ewing</u>, a direct appeal from a judgment of conviction, the Supreme Court recognized the longstanding "tradition of deferring to state legislatures in making and implementing" policy decisions about sentencing laws. 538 U.S. at 24. And while the Court also recognized a "narrow proportionality principle," it held the Eighth Amendment "does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are grossly disproportionate to the crime." <u>Id</u>. at 23 (internal quotations omitted).

The Court did not find Ewing's sentence of twenty-five-years-to-life to meet the standard of gross disproportionality. His commitment offense—grand theft—was based on his appropriation of $1,200.00 worth of merchandise from a golf pro shop. It was committed while

he was on parole from a sentence for burglary and robbery. <u>Id</u>. at 20, 28. His record included "numerous misdemeanor and felony offenses," most of them committed while on probation or parole, and nine prison terms. <u>Id</u>. at 30. The Court concluded: "To be sure, Ewing's sentence is a long one. But it reflects a rational legislative judgment, entitled to deference, that offenders who have committed serious or violent felonies and who continue to commit felonies must be incapacitated." <u>Id</u>.

<u>Lockyer</u> addressed the interaction of the AEDPA and the Court's Eighth Amendment jurisprudence. As in <u>Ewing</u>, the Court recognized the lack of clarity in its earlier Eighth Amendment cases but described the "governing legal principle" in such cases to be "gross disproportionality." <u>Lockyer</u>, 538 U.S. at 72. The Court ultimately found the California Court of Appeal had not applied federal law in an unreasonable fashion or reached a result contrary to federal precedent on indistinguishable facts. <u>Id</u>. at 74. As a result, it upheld Andrade's sentence of fifty-years-to-life following his convictions for two counts of grand theft stemming from two incidents of shoplifting and the findings he had suffered three prior convictions for residential burglary. <u>Id</u>. at 65. His record also included two federal drug convictions, a federal escape charge, and some misdemeanor thefts. <u>Id</u>. at 66-67.

In light of <u>Lockyer</u> and <u>Ewing</u>, whether the state Court of Appeal's determination was an unreasonable application of clearly established federal law depends on the severity of the offense, the availability of parole and length of sentence, and the impact of recidivism. <u>Id</u>. at 72.

As the state Court of Appeal observed, petitioner armed himself, chose a vulnerable victim, struggled with her when she resisted his initial demands for her keys and purse, used his gun to threaten those who came to the victim's aid and then fled in her car, which was later found abandoned. The offense was a serious one, accomplished with actual violence. <u>See</u> <u>Reyes v. Brown</u>, 399 F.3d 964, 969 (9th Cir. 2005).

/////

/////

11

As a third striker, petitioner will not earn conduct credit on his sentence and thus will not be eligible for parole until he has served more than twenty-five years.[3] Contra Rummel v. Estelle, 445 U.S. 263, 280 (1980) (life sentence for small theft ameliorated by Texas policy of liberal grant of good time that might make person eligible for parole in twelve years). Nevertheless, the severity of the sentence alone will not make it grossly disproportionate. Harmelin v. Michigan, 501 U.S. 957 (1991) (sentence of life without the possibility of parole for possession of large amount of drugs did not violate Eighth Amendment).

Finally, there is the impact of petitioner's recidivism and the severity of petitioner's prior crimes. See Ramirez v. Castro, 365 F.3d 755, 769 (9th Cir. 2004). As the Court of Appeal noted, petitioner's prior strikes arose from an incident with many similarities to the underlying crime: brandishing a gun and threatening to shoot, petitioner forced a woman to move out of the driver's seat of her Cadillac. He threatened two men who came to the woman's aid, took off in the car and then fled after he crashed it into a parked car. He broke into a house and hid after threatening the residents with his gun. Compare Answer, Ex. D at 15-16 with CT 344-345.

His later convictions include possession of firearms by an ex-felon, assault on his girlfriend, and possession of methamphetamine. CT 346-347. As the Supreme Court has observed:

> One in [defendant's] position has been both graphically informed of the consequences of lawlessness and given an opportunity to reform, all to no avail. Article 63 [the Texas recidivist statute] thus is nothing more than a societal decision that when such a person commits yet another felony, he should be subjected to the admittedly serious penalty of incarceration for life, subject only to the State's judgment as to whether to grant him parole.

Rummel v. Estelle, 445 U.S. at 278. Petitioner, too, has been "informed of the consequences of lawlessness," but chose to ignore them. This case does not raise a presumption of gross

---

[3] A third striker is not permitted to earn custody credits against his minimum sentence. In re Cervera, 24 Cal. 4th 1073 (2001).

1  disproportionality.  See Rios v. Garcia, 390 F.3d 1082, 1086 (9th Cir. 2004); compare Ramirez v.
2  Castro, 365 F.3d 768 ("three strikes" sentence grossly disproportionate to the underlying petty
3  theft with a prior theft when priors had been shoplifting incidents in which defendant pushed a
4  security guard and a confederate drove over the foot of a different security guard and defendant
5  had served no time in prison).  The court thus does not find the state Court of Appeal to have
6  interpreted the facts or the federal law in an unreasonable manner.

7         Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a
8  writ of habeas corpus be denied.

9         These findings and recommendations are submitted to the United States District
10 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty
11 days after being served with these findings and recommendations, any party may file written
12 objections with the court and serve a copy on all parties.  Such a document should be captioned
13 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
14 shall be served and filed within ten days after service of the objections.  The parties are advised
15 that failure to file objections within the specified time may waive the right to appeal the District
16 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).
17 DATED:  June 7, 2005.

_____
UNITED STATES MAGISTRATE JUDGE

2/gore1779.157